## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEITH WELLMAN and BRIAN CLUGSTON, Derivatively on Behalf of MODERNA, INC., | Case No.: |
| Plaintiffs, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| STEPHANE BANCEL, JAMES M. MOCK, STEPHEN HOGE, NOUBAR AFEYAN, SANDRA HORNING, ELIZABETH NABEL, FRANCOIS NADER, PAUL SAGAN, ELIZABETH TALLETT, ROBERT LANGER, and STEPHEN BERENSON, | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and, | |
| MODERNA, INC., | |
| Nominal Defendant. | |

Plaintiffs Keith Wellman and Brian Clugston ("Plaintiffs"), by and through their undersigned counsel, bring this derivative complaint for the benefit of nominal defendant Moderna, Inc. (herein referred to as "Moderna" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Company's publicly available documents, including the allegations of the amended class action complaint filed in the securities class action captioned *Wentz v. Moderna, Inc., et al.*,

Case No. 1:24-cv-12058-IT (D. Mass.) (the "Securities Class Action"), conference call transcripts and announcements, filings with the United States Securities and Exchange Commission (the "SEC"), press releases published by and regarding Moderna, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Moderna against certain officers and members of the Company's Board for breaches of their fiduciary duties from at least January 18, 2023 through the present (the "Relevant Period") and violation of the federal securities laws by causing the issuance of materially false and misleading statements in the Company's SEC filings and in other public statements that have exposed the Company to massive class-wide liability, as well as the expenditure of substantial defense costs in connection with the Securities Class Action, as set forth below.

2.     Moderna is a biotechnology company that primarily develops and manufactures mRNA therapeutics and vaccines for the prevention and treatment of infectious diseases, autoimmune diseases, cancer, and cardiovascular diseases.

3.     One of Moderna's products is an mRNA vaccine for Respiratory Syncytial Virus ("RSV") called mRESVIA ("mRNA-1345"). The Company's officers and directors overstated the efficacy and commercial prospects of the mRNA-1345 vaccine, consistently touting an 83.7% efficacy rate throughout the Relevant Period.

4.     The truth began to emerge on May 31, 2024, when Moderna issued a press release, which disclosed that the efficacy of mRNA-1345 was only 78.7%, substantially lower than the rate that the Individual Defendants had been boasting.

5.    On this news, the price of Moderna stock declined by 5.9%, from a close of $151.49 on May 30, 2024 to close at $142.55 per share on May 31, 2024

6.    On June 6, 2024, the Company further disclosed that after 18 months, mRNA-1345 significantly underperformed in comparison to vaccines offered by Moderna's competitors. On this news, the price of Moderna stock declined by 11.01%, from a close of $137.60 on June 25, 2024 to close at $122.45 per share on June 26, 2024.

7.    As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

8.    Plaintiffs did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) and Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

10.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

11.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.    In connection with the acts, conduct and other wrongs complained of herein, the

Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13.      Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b)(1), as Moderna maintains its principal executive offices in this District and a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District.

## PARTIES

14.      Plaintiffs are, and were at all relevant times, shareholders of the Company.

15.      Nominal Defendant Moderna is a Delaware corporation with principal executive offices located at 325 Binney Street, Cambridge, Massachusetts 02142.  The Company's common stock trades on NASDAQ under the ticker symbol "MRNA."

16.      Defendant Stephane Bancel ("Bancel") has served as Moderna's Chief Executive Officer ("CEO") since October 2011 and as a member of the Board since March 2011. According to the Company's public filings, Defendant Bancel received $17,068,514 in 2023 in compensation from the Company. Defendant Bancel is named as a defendant in the Securities Class Action. As of March 7, 2024, Defendant Bancel beneficially owned 30,113,590 shares of Moderna stock, worth nearly $3 billion[1] and constituting 7.7% of the Company's total outstanding shares of common stock. During the Relevant Period, Defendant Bancel sold 1,760,000 shares of Company stock while in possession of material non-public information for proceeds of $254,066,917. While the price of Moderna stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Bancel made the following sales of Company stock:

---

[1] Valuations of the Individual Defendants' personal holdings of Company stock are based on the $99.48 per share closing price of Moderna stock on March 7, 2024.

- On January 25, 2023, Defendant Bancel sold 40,000 shares of personal holdings of Company stock at an average price of $191.97, reaping $7,678,720 in proceeds.

- On January 26, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $190.62, reaping $7,624,880 in proceeds.

- On February 1, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $171.40, reaping $6,855,960 in proceeds.

- On February 2, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $173.57, reaping $6,942,720 in proceeds.

- On February 8, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $167.16, reaping $6,686,520 in proceeds.

- On February 9, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $167.02, reaping $6,680,800 in proceeds.

- On February 15, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $175.26, reaping $7,010,320 in proceeds.

- On February 16, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $173.08, reaping $6,923,080 in proceeds.

- On February 22, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $159.07, reaping $6,362,720 in proceeds.

- On February 23, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $147.00, reaping $5,880,080 in proceeds.

- On March 1, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $135.70, reaping $5,428,000 in proceeds.

- On March 2, 2023 sold 40,000 shares of personal holdings of Company stock at

an average price of $137.79, reaping $5,511,600 in proceeds.

- On March 8, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $141.47, reaping $5,658,800 in proceeds.

- On March 9, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $139.71, reaping $5,588,320 in proceeds.

- On March 22, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $150.35, reaping $6,014,000 in proceeds.

- On March 23, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $150.11, reaping $6,004,520 in proceeds.

- On March 29, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $148.92, reaping $5,956,799 in proceeds.

- On March 30, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $148.69, reaping $5,947,519 in proceeds.

- On April 5, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $154.69, reaping $6,187,600 in proceeds.

- On April 6, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $156.87, reaping $6,274,960 in proceeds.

- On April 12, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $157.15, reaping $6,285,880 in proceeds.

- On April 13, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $161.26, reaping $6,450,280 in proceeds.

- On April 19, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $142.83, reaping $5,713,320 in proceeds.

- On April 20, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $142.80, reaping $5,712,000 in proceeds.

- On April 26, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $131.96, reaping $5,278,520 in proceeds.

- On April 27, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $131.16, reaping $5,246,280 in proceeds.

- On May 3, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $131.42, reaping $5,256,799 in proceeds.

- On May 4, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $135.52, reaping $5,420,680 in proceeds.

- On May 10, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $132.41, reaping $5,296,520 in proceeds.

- On May 11, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $127.98, reaping $5,119,080 in proceeds.

- On May 17, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $125.17, reaping $5,006,640 in proceeds.

- On May 18, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $124.36, reaping $4,974,400 in proceeds.

- On May 24, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $132.01, reaping $5,280,520 in proceeds.

- On May 25, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $127.77, reaping $5,110,920 in proceeds.

- O May 31, 2023 sold 80,000 shares of personal holdings of Company stock at an

average price of $127.09, reaping $10,166,960 in proceeds.

- On June 1, 2023 sold 80,000 shares of personal holdings of Company stock at an average price of $127.22, reaping $10,177,840 in proceeds.

- On June 7, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $126.12, reaping $5,044,800 in proceeds.

- On June 8, 2023 sold 40,000 shares of personal holdings of Company stock at an average price of $124.44, reaping $4,977,720 in proceeds.

- On June 14, 2023 sold 80,000 shares of personal holdings of Company stock at an average price of $126.22, reaping $10,097,840 in proceeds.

- On June 15, 2023 sold 80,000 shares of personal holdings of Company stock at an average price of $127.90, reaping $10,232,000 in proceeds.

17.    Defendant Noubar Afeyan ("Afeyan") is one of Moderna's co-founders and has served as a member of the Board since 2010 and as its Chairman since 2012. According to the Company's public filings, Defendant Afeyan received $663,519 in 2023 in compensation from the Company. As of March 7, 2024, Defendant Afeyan beneficially owned 12,017,153 shares of Moderna stock, worth roughly $1.2 billion and constituting 3.1% of the Company's total outstanding shares of common stock. During the Relevant Period, Defendant Afeyan sold 457,832 shares of Company stock while in possession of material non-public information for proceeds of $67,156,789. While the price of Moderna stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Afeyan made the following sales of Company stock:

- On January 18, 2023, Defendant Afeyan sold 10,000 shares of personal holdings of Company stock at an average price of $200.20 per share, reaping $2,002,000

in proceeds.

- On January 25, 2023, Defendant Afeyan sold 10,000 shares of personal holdings of Company stock at an average price of $194.33 per share, reaping $1,943,300 in proceeds.

- On February 8, 2023, Defendant Afeyan sold 20,000 shares of personal holdings of Company stock at an average price of $166.92 per share, reaping $3,338,420 in proceeds.

- On February 15, 2023, Defendant Afeyan sold 10,000 shares of personal holdings of Company stock at an average price of $173.17 per share, reaping $1,731,699 in proceeds.

- On February 22, 2023, Defendant Afeyan sold 10,000 shares of personal holdings of Company stock at an average price of $160.35 per share, reaping $1,603,500 in proceeds.

- On March 1, 2023, Defendant Afeyan sold 10,000 shares of personal holdings of Company stock at an average price of $139.00 per share, reaping $1,390,000 in proceeds.

- On May 31, 2023, Defendant Afeyan sold 15,000 shares of personal holdings of Company stock at an average price of $127.70 per share, reaping $1,915,440 in proceeds.

- On June 7, 2023, Defendant Afeyan sold 15,000 shares of personal holdings of Company stock at an average price of $126.17 per share, reaping $1,892,610 in proceeds.

- On June 14, 2023, Defendant Afeyan sold 15,000 shares of personal holdings of

Company stock at an average price of $126.73 per share, reaping $1,901,025 in proceeds.

- On July 5, 2023, Defendant Afeyan sold 15,000 shares of personal holdings of Company stock at an average price of $125.84 per share, reaping $1,887,585 in proceeds.

- On July 12, 2023, Defendant Afeyan sold 15,000 shares of personal holdings of Company stock at an average price of $125.91 per share, reaping $1,888,575 in proceeds.

- On July 19, 2023, Defendant Afeyan sold 15,000 shares of personal holdings of Company stock at an average price of $125.16 per share, reaping $1,877,385 in proceeds.

- On May 15, 2024, Defendant Afeyan sold 15,000 shares of personal holdings of Company stock at an average price of $127.55 per share, reaping $1,913,250 in proceeds.

- On May 22, 2024, Defendant Afeyan sold 15,000 shares of personal holdings of Company stock at an average price of $154.27 per share, reaping $2,314,050 in proceeds.

- On May 29, 2024, Defendant Afeyan sold 20,000 shares of personal holdings of Company stock at an average price of $144.42 per share, reaping $2,888,440 in proceeds.

- On June 5, 2024, Defendant Afeyan sold 15,000 shares of personal holdings of Company stock at an average price of $150.66 per share, reaping $2,259,840 in proceeds.

- On June 11, 2024, Defendant Afeyan sold 202,832 shares of personal holdings of Company stock at an average price of $148.85 per share, reaping $30,191,340 in proceeds.

- On June 12, 2024, Defendant Afeyan sold 15,000 shares of personal holdings of Company stock at an average price of $146.92 per share, reaping $2,203,785 in proceeds.

- On June 18, 2024, Defendant Afeyan sold 15,000 shares of personal holdings of Company stock at an average price of $134.30 per share, reaping $2,014,545 in proceeds.

18.     Defendant Sandra Horning ("Horning") has served as a member of the Board since 2020. According to the Company's public filings, Defendant Horning received $481,269 in 2023 in compensation from the Company. As of March 7, 2024, Defendant Horning beneficially owned 51,114 shares of Moderna stock, worth roughly $5 million.

19.     Defendant Elizabeth Nabel ("Nabel") has served as a member of the Board since 2015. According to the Company's public filings, Defendant Nabel received $476,245 in 2023 in compensation from the Company. As of March 7, 2024, Defendant Nabel beneficially owned 15,987 shares of Moderna stock, worth roughly $1.5 million.

20.     Defendant Francois Nader ("Nader") has served as a member of the Board since 2019. According to the Company's public filings, Defendant Nader received $481,269 in 2023 in compensation from the Company. As of March 7, 2024, Defendant Nader beneficially owned 89,016 shares of Moderna stock, worth roughly $8.8 million.

21.     Defendant Paul Sagan ("Sagan") has served as a member of the Board since 2018 and serves as a member of the Audit Committee. According to the Company's public filings,

Defendant Sagan received $461,269 in 2023 in compensation from the Company. As of March 7, 2024, Defendant Sagan beneficially owned 587,832 shares of Moderna stock, worth roughly $58 million.

22.    Defendant Elizabeth Tallett ("Tallett") has served as a member of the Board since 2020 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant Tallett received $481,269 in 2023 in compensation from the Company. As of March 7, 2024, Defendant Tallett beneficially owned 40,152 shares of Moderna stock, worth nearly $4 million.

***Former Director Defendants***

23.    Defendant Robert Langer ("Langer") is one of Moderna's co-founders and served as a member of the Board from 2010 until July 2024. According to the Company's public filings, Defendant Langer received $461,269 in 2023 in compensation from the Company. As of March 7, 2024, Defendant Langer beneficially owned 11,808,993 shares of Moderna stock, worth nearly $1.2 billion and constituting 3.1% of the Company's total outstanding shares of common stock.

24.    Defendant Stephen Berenson ("Berenson") served as a member of the Board from 2017 until July 2024. According to the Company's public filings, Defendant Berenson received $471,245 in 2023 in compensation from the Company. As of March 7, 2024, Defendant Langer beneficially owned 190,384 shares of Moderna stock, worth nearly $19 million.

***Officer Defendants***

25.    Defendant James M. Mock ("Mock") has served as Moderna's Chief Financial Officer ("CFO") since September 2022. According to the Company's public filings, Defendant Mock received $4,317,185 in 2023 in compensation from the Company. Defendant Mock is named as a defendant in the Securities Class Action. As of March 7, 2024, Defendant Mock

beneficially owned 27,216 shares of Moderna stock, worth roughly $2.7 million. During the Relevant Period, Defendant Mock sold 1,522 shares of Company stock while in possession of material non-public information for proceeds of $228,964. While the price of Moderna stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Mock made the following sales of Company stock:

- On May 28, 2024, Defendant Mock sold 648 shares of personal holdings of Company stock at an average price of $162.47 per share, reaping $105,283 in proceeds.

- On May 29, 2024, Defendant Mock sold 183 shares of personal holdings of Company stock at an average price of $144.50 per share, reaping $26,444 in proceeds.

- On June 3, 2024, Defendant Mock sold 691 shares of personal holdings of Company stock at an average price of $140.72 per share, reaping $97,237 in proceeds.

26.    Defendant Stephen Hoge ("Hoge") has served as Moderna's President since February 2015. According to the Company's public filings, Defendant Hoge received $7,339,166 in 2023 in compensation from the Company. Defendant Hoge is named as a defendant in the Securities Class Action. As of March 7, 2024, Defendant Hoge beneficially owned 5,312,014 shares of Moderna stock, worth roughly $528 million. During the Relevant Period, Defendant Hoge sold 34,914 shares of Company stock while in possession of material non-public information for proceeds of $4,628,209 and constituting 1.4% of the Company's total outstanding shares of common stock. While the price of Moderna stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Hoge made the

following sales of Company stock:

- On February 10, 2023, Defendant Hoge sold 245 shares of personal holdings of Company stock at an average price of $163.90 per share, reaping $40,155 in proceeds.

- On March 1, 2023, Defendant Hoge sold 1,072 shares of personal holdings of Company stock at an average price of $138.03 per share, reaping $147,962 in proceeds.

- On March 2, 223, Defendant Hoge sold 1,177 shares of personal holdings of Company stock at an average price of $136.43 per share, reaping $160,582 in proceeds.

- On May 10, 2023, Defendant Hoge sold 250 shares of personal holdings of Company stock at an average price of $133.37 per share, reaping $33,343 in proceeds.

- On May 30, 2023, Defendant Hoge sold 1,181 shares of personal holdings of Company stock at an average price of $124.95 per share, reaping $147,568 in proceeds.

- On June 2, 2023, Defendant Hoge sold 309 shares of personal holdings of Company stock at an average price of $130.32 per share, reaping $40,269 in proceeds.

- On June 15, 2023, Defendant Hoge sold 15,000 shares of personal holdings of Company stock at an average price of $125.93 per share, reaping $1,888,950 in proceeds.

- On May 29, 2024, Defendant Hoge sold 341 shares of personal holdings of

Company stock at an average price of $144.50 per share, reaping $49,276 in proceeds.

- On June 3, 2024, Defendant Hoge sold 339 shares of personal holdings of Company stock at an average price of $140.72 per share, reaping $47,704 in proceeds.

- On June 17, 2024, Defendant Hoge sold 15,000 shares of personal holdings of Company stock at an average price of $138.16 per share, reaping $2,072,400 in proceeds.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers and/or directors of Moderna, and because of their ability to control the business and corporate affairs of Moderna, the Individual Defendants owed Moderna and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Moderna in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Moderna and its shareholders so as to benefit all shareholders equally.

28.     Each director and officer of the Company owes to Moderna and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Moderna, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.     To discharge their duties, the officers and directors of Moderna were required

to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

31.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Moderna, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

32.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty: to ensure that Moderna implemented and properly monitored the Company's internal controls over financial reporting, including those relating to Moderna's free cash flow and non-GAAP operating margin practices; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

33.    To discharge their duties, the officers and directors of Moderna were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Moderna were required to, among other things:

a)  ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Moderna's own Code of Ethics and Business Conduct (the "Code of Conduct");

b)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)  remain informed as to how Moderna conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

d)  establish and maintain systematic and accurate records and reports of the business and internal affairs of Moderna and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e)  maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that

17

Moderna's publicly disclosed financial information would be accurate;

   f)   exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

   g)   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

   h)   examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

34.     Each of the Individual Defendants further owed to Moderna and the shareholders the duty of loyalty requiring that each favor Moderna's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

35.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Moderna and were at all times acting within the course and scope of such agency.

36.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Moderna.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

38.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

39.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

40.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Moderna, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

42.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Moderna and at all times acted within the course and scope of such agency.

## MODERNA'S CODE OF CONDUCT

43.     Moderna's Code of Conduct begins with a message from Defendant Bancel,

which states, in pertinent part:

> At Moderna, our mission is to deliver on the promise of mRNA science to create a
> new generation of transformative medicines for patients. In pursuit of this mission,
> and as our company continues to grow, we always strive to do the right thing, the
> right way.
>
> Our work is done with a deep sense of purpose and responsibility for patients, the
> environment, our local communities and each other. We measure our success on
> the impact we have on improving people's lives.
>
> **Our commitment to positively impacting human health is built on a foundation
> of integrity, quality and respect. At all times, we act responsibly and ethically
> in everything we do.**
>
> **The Moderna Code of Ethics and Business Conduct is our guide to how we
> conduct ourselves and our activities globally.**

(Emphasis in original).

44.     The Code of Conduct applies to "all directors, officers, employees, contractors

and anyone who conducts business for or on behalf of Moderna," and failure to comply with the

Code of Conduct "will subject all staff to disciplinary action, up to and including termination."

45.     In a subsection titled "We Advance Science Responsibly," the Code of Conduct

states, in pertinent part:

> We maintain high ethical and scientific standards, ensuring that our products are
> considered safe and effective for the benefit of society.
> How We Live Out Values
> Delivering high-quality products means we:
>
>                     \* \* \*
>
> ଔ Maintain high standards of integrity and safety in research and clinical trials

46.     In a subsection titled "We Communicate Accurately," the Code of Conduct

states:

We are honest and transparent in our communications. Sharing accurate scientific information is vital to improving health across the world. The integrity of our information assures regulators and patients that our products are not misrepresented.

**How We Live Our Values**

Sharing our knowledge responsibly means we:

- Ꜩ Make sure the information we provide about our products and the diseases they treat or prevent is complete, accurate, fair, balanced and based on scientific evidence

- Ꜩ Only make statements on Moderna's behalf if we have the proper authorization to do so

- Ꜩ Act responsibly, transparently and in accordance with country regulations when posting anything online or on social media

47.    In a subsection titled "We Safeguard Information and Assets," the Code of Conduct includes a commitment to "[p]rotect Moderna's equipment from misuse, theft and waste."

48.    In a section titled "We Act Legally and Ethically," the Code of Conduct states the following, in pertinent part:

We do business the right way and make decisions ethically, and by doing this we build trust in Moderna and maintain our reputation.

**How We Live Our Values**

Doing business the right way means we:

* * *

- Ꜩ Compete legally, fairly, honestly and transparently to obtain business

* * *

- Ꜩ Don't buy or sell Moderna stock, or the stock of any company with which we do business, when we have insider information relevant to the applicable situation

       ℭ  Maintain all books, records and accounts accurately

49.      In a subsection titled "We Conduct Our Business with Transparency," the Code of Conduct includes a commitment to "[p]rovide full, fair, accurate, timely and clear information to stakeholders."

## MODERNA'S AUDIT COMMITTEE CHARTER

50.      Pursuant to the Company's Audit Committee Charter, the purposes of the Audit Committee are to:

- oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements;
- take, or recommend that the Board take, appropriate action to oversee the qualifications, independence and performance of the Company's independent auditors; and
- prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

51.      In a subsection titled "Audited Financial Statements and Annual Audit," the Audit Committee Charter states the following, in pertinent part:

- The Audit Committee shall review the overall audit plan (both external and internal (if any)) with the independent auditors, the internal auditors (if any) and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive").

- The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the independent auditors the Company's annual audited financial statements and related disclosures prior to the filing of the Company's Annual Report on Form 10-K, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

- The Audit Committee must review:

(i) any analyses prepared by management, the internal auditors (if any) and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the independent auditors. The Audit Committee may also consider other material written communications between the registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

(ii) major issues, if any, as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

(iii) major issues, if any, regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv) the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

52.     In a subsection titled "**Earnings Press Releases**," the Audit Committee Charter states that the Audit Committee "shall review and discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies."

53.     In a subsection titled "**Risk Assessment and Management**," the Audit Committee Charter states the following, in pertinent part:

• The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

* * *

• In connection with the Audit Committee's discussion of the Company's risk assessment and management guidelines, the Audit Committee may discuss or consider the Company's major financial risk exposures and the steps that

the Company's management has taken to monitor and control such exposures.

54.    In a subsection titled "**Legal and Regulatory Compliance**," the Audit Committee Charter states the following, in pertinent part:

The Audit Committee may discuss with management and the independent auditors, and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements. After these discussions, the Audit Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

## SUBSTANTIVE ALLEGATIONS

### *Background*

55.    Moderna is a biotechnology company, founded in 2010, that operates globally. The Company primarily develops and manufactures mRNA therapeutics and vaccines for the prevention and treatment of infectious diseases, autoimmune diseases, cancer, and cardiovascular diseases.

56.    Moderna represents itself as "a leader in the creation of the field of mRNA medicines . . . reimagining how medicines are made and transforming how [it] treat[s] and prevent[s] disease for everyone."

57.    One of Moderna's products is mRNA-1345, an mRNA vaccine designed to protect adults aged 60 years and older from lower respiratory tract disease caused by RSV infection.

### *Materially False and Misleading Statements*

58.    On January 18, 2023, Moderna issued a press release titled "Moderna Announces mRNA-1345, an Investigational Respiratory Syncytial Virus (RSV) Vaccine, Has Met Primary Efficacy Endpoints in Phase 3 Trial in Older Adults." The press release stated the

following, in pertinent part:

> Moderna [. . .] today announced positive topline data from its ConquerRSV Phase 3 pivotal efficacy trial of mRNA-1345, an investigational mRNA vaccine targeting respiratory syncytial virus (RSV) in older adults. ***Following review by an independent Data and Safety Monitoring Board (DSMB), the primary efficacy endpoints have been met, including vaccine efficacy (VE) of 83.7% (95.88% CI: 66.1%, 92.2%; p<0.0001) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms***. Based on these results, Moderna intends to submit for regulatory approval in the first half of 2023.

> "Today's results represent an important step forward in preventing lower respiratory disease due to RSV in adults 60 years of age and older. These data are encouraging, and represent the second demonstration of positive phase 3 trial results from our mRNA infectious disease vaccine platform after, Spikevax, our COVID-19 vaccine. We look forward to publishing the full data set and sharing the results at an upcoming infectious disease medical conference," said [Defendant] Bancel[.] "Respiratory diseases are a major public health priority given they have a significant health impact and are a leading cause of hospitalization. For these reasons, in addition to our mRNA-1345 RSV vaccine candidate, we are committed to developing a portfolio of respiratory mRNA vaccines to target the most significant viruses causing respiratory disease, including COVID-19, influenza, and human metapneumovirus.[2]

59.    On January 30, 2023, Moderna issued a press release titled "Moderna Granted FDA Breakthrough Therapy Designation for mRNA-1345, An Investigational Respiratory Syncytial Virus (RSV) Vaccine Candidate." The press release stated the following, in pertinent part:

> Moderna [. . .] today announced mRNA-1345, an investigational mRNA vaccine candidate for respiratory syncytial virus (RSV), has been granted Breakthrough Therapy Designation by the U.S. Food and Drug Administration (FDA) for the prevention of RSV-associated lower respiratory tract disease (RSV-LRTD) in adults aged 60 years or older. The designation was based on positive topline data from the ConquerRSV Phase 3 pivotal efficacy trial.

> "The FDA's Breakthrough Designation for mRNA-1345 further emphasizes the significant health impact of RSV in older adults and the high unmet need," said [Defendant] Bancel[.] "With this designation, we look forward to productive conversations with the FDA in the hopes of bringing our RSV vaccine candidate for older adults to the market safely and quickly. Moderna's mRNA platform has now demonstrated two positive Phase 3 infectious disease trial results and we

---

[2] Unless indicated otherwise, all emphasis is added.

continue to advance a portfolio of respiratory mRNA vaccines targeting the most serious diseases. We are grateful to the FDA for this designation."

The FDA's Breakthrough Therapy Designation is granted to expedite the development and review of drugs that are intended to treat a serious condition, and when preliminary clinical evidence indicates the drug or vaccine may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s).

60.     On February 23, 2023, in announcing its fourth quarter and full year 2022

financial results, the Company stated:

"2022 was another impressive year for Moderna, with over $19 billion in revenue and significant clinical breakthroughs across our portfolio. We continue to provide our Omicron-targeting bivalent vaccines worldwide, with the latest real-world evidence highlighting the continued protection of our vaccines against hospitalization and death," said [Defendant] Bancel[.] "Our infectious disease platform continues to progress with positive Phase 3 data in RSV for older adults.

We are investing to scale Phase 3 manufacturing for personalized cancer vaccines so that we can run several Phase 3 studies simultaneously. With planned R&D investments of $4.5 billion for the year, I am excited about the new medicines we believe we will bring to patients in the coming few years."

* * *

- RSV vaccine *in older adults (mRNA-1345) met its primary efficacy endpoint and received Breakthrough Therapy Designation from FDA. mRNA-1345 demonstrated vaccine efficacy of 83.7% against RSV lower respiratory tract disease, defined by 2 or more symptoms, and 82.4% with 3 or more symptoms in older adults*. mRNA-1345 was generally well-tolerated, with no safety concerns identified by the Data Safety Monitoring Board (DSMB). Based on these results, Moderna expects to submit a Biologics License Application (BLA) for mRNA-1345 to the FDA in the first half of 2023. The pediatric Phase 1 trial of mRNA-1345 is fully enrolled.

61.     During an earnings call, hosted by the Company on the same day, Defendant

Hoge stated:

And moving to RSV, as you know, we shared the top line results from our Phase 3 RSV study in older adults earlier this year. And today, we shared additional data that was presented this morning at RSVVW. *The top line results we have seen are incredibly encouraging and we are grateful to the FDA for breakthrough therapy*

*designation for mRNA-1345, which further emphasizes the significant health impact of RSV in older adults and the high unmet need. In the top line data presented in January, the mRNA-1345 demonstrated 83.7% vaccine efficacy and the primary endpoint of lower respiratory tract disease with two or more symptoms*. 1345 was found to be generally well tolerated and there were no safety concerns identified by the Data and Safety Monitoring Board.

62.    On February 24, 2023, Moderna filed an annual report on Form 10-K with the SEC (the "2022 10-K"), signed by Defendants Bancel, Mock, Afeyan, Berenson, Horning, Langer, Nader, Nabel, Sagan, and Tallett. With respect to the Company's strategy, the 2022 10-K stated, in pertinent part:

We believe that the development of mRNA medicines represents a significant breakthrough for patients, our industry and human health globally. Our success in developing a highly effective vaccine against COVID-19, going from sequence selection, conducting clinical trials and to receipt of regulatory authorization for emergency use, all in less than a year, and subsequently receiving BLA approval from the FDA, provides a visible example of the promise of mRNA medicine. The Moderna COVID-19 Vaccine/Spikevax has been authorized for use or approved in over 70 countries. As our first approved product, Spikevax has helped hundreds of millions of people worldwide combat the COVID-19 pandemic. We believe our success in developing our COVID-19 vaccines has positive implications beyond infectious disease vaccines and across our entire pipeline. We currently have 48 programs in development, and our pipeline spans infectious diseases, including vaccines against respiratory diseases, latent diseases and public health pathogens, as well as four therapeutic areas: immuno-oncology, rare diseases, cardiovascular diseases and autoimmune diseases.

In order to deliver on the full scope of the mRNA opportunity and maximize long-term value for patients and investors, we have formulated strategic priorities that guide our near-term and long-term goals:

1.    **Execute our commercialization plans for our COVID-19 vaccines**. Our COVID-19 vaccines have been approved in more than 70 countries. We are transitioning to prepare for an endemic, commercial market for COVID-19 vaccines in the United States and other countries. We are working to build a differentiated commercial model, with active commercial subsidiaries across North America, Europe and the Asia-Pacific region, providing us with local commercial teams in key markets around the world.

2.    **Build an unrivaled seasonal respiratory vaccine franchise**. As we build our respiratory franchise, we are applying our experience and using our mRNA platform to develop medicines that can help prevent hospitalizations and deaths

from the most prevalent respiratory viruses. We are currently developing vaccines against COVID-19, seasonal flu and RSV individually, while pursuing parallel development of combination vaccines. In January 2023, we announced that our older adult RSV vaccine candidate had met its primary efficacy endpoints in a Phase 3 trial. Our long-term vision is to develop, and seek regulatory approval for, a convenient, annual, single-dose booster against as many respiratory viruses as possible. mRNA vaccines have the ability to combine multiple different antigens into one vaccine. We believe that combination vaccines have the potential to improve health outcomes at lower costs due to higher compliance, better uptake, a larger benefit to the healthcare system (including through reduced vaccine administration costs) and increased consumer convenience. We have preparations underway for multiple potential vaccine launches globally over the next several years.

63.     With respect to the efficacy of mRNA-1345, the 2022 10-K stated:

*We are developing an RSV vaccine for children and adults. In older adults, mRNA-1345 reported positive topline Phase 3 efficacy results in January 2023; in pediatrics, mRNA-1345 is ongoing in a Phase 1 study.*

\* \* \*

mRNA-1345 encodes an engineered form of the RSV F protein stabilized in the prefusion conformation and is formulated in our proprietary LNP. We believe that neutralizing antibodies elicited by mRNA-1345 may lead to an efficacious RSV vaccine.

*Latest data and next steps*

***In January 2023, we announced that mRNA-1345 had met primary efficacy endpoints in the pivotal Phase 3 trial in older adults, ages 60 and older. mRNA-1345 demonstrated vaccine efficacy (VE) of 83.7% (95.88% CI: 66.1%, 92.2%; p<0.0001) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms. The other primary efficacy endpoint against RSV-LRTD defined by three or more symptoms was also met, with a VE of 82.4% (96.36% CI: 34.8%, 95.3%; p=0.0078).*** mRNA-1345 was generally well-tolerated with no safety concerns identified by the DSMB. The overall rate of severe (Grade 3 or greater) solicited systemic adverse reactions was 4.0% for mRNA-1345 and 2.8% for placebo. The overall rate of Grade 3 or greater solicited local adverse reactions was 3.2% for mRNA-1345 and 1.7% for placebo. The study is ongoing, and an updated analysis of safety and tolerability will be provided at the time of regulatory submission.

Based on the positive topline data from the pivotal Phase 3 efficacy trial, the FDA granted mRNA-1345 Breakthrough Therapy Designation for the prevention of

RSV-LRTD in adults 60 years or older. We intend to submit mRNA-1345 to the FDA for regulatory approval for older adults in the first half of 2023.

64.    On April 11, 2023, Moderna issued a press release titled "Moderna Announces Clinical and Program Updates at 4th Vaccines Day." The press release stated the following regarding mRNA-1345:

**mRNA-1345**

mRNA-1345, Moderna's RSV vaccine candidate, is in an ongoing Phase 2/3, randomized, observer-blind, placebo-controlled case-driven trial (ConquerRSV) in adults aged 60 years and older. In this study, 35,541 participants from 22 countries were randomized 1:1 to receive one dose of mRNA-1345 or placebo.

Following review by an independent Data and Safety Monitoring Board (DSMB), the primary efficacy endpoints have been met, ***including vaccine efficacy (VE) of 83.7%*** (95.88% CI: 66.1%, 92.2%; p<0.0001) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms. Vaccine efficacy was maintained in participants over 70 years of age and participants with comorbidities. mRNA-1345 was well tolerated; solicited adverse reactions were mostly grade 1 or grade 2 in severity. No cases of Guillain-Barre Syndrome (GBS) have been reported.

mRNA-1345 has been granted Breakthrough Therapy Designation (BTD) by the FDA for the prevention of RSV-LRTD in adults aged 60 years or older.

65.    On May 4, 2023, during the Company's first quarter 2023 earnings call, Defendant Hoge stated:

Moving to RSV, we're pleased by the profile of our vaccine in older adults with high and consistent efficacy against RSV lower respiratory tract disease across populations in our large Phase 3 study. ***At two recent medical meetings, we've shared data showing our vaccine's efficacy was consistently high across all age groups, including in the oldest adult and in participants with preexisting comorbidities that put them at higher risk***. mRNA-1345 has also shown a favorable tolerability profile with AEs mostly grade 1 or grade 2, mild to moderate. As we shared during Vaccines Day, today, we have not seen any cases of Guillain-Barré syndrome or other severe demyelinating events in the trial.

66.    On July 5, 2023, Moderna issued a press release titled "Moderna Announces Global Regulatory Submissions For Its Respiratory Syncytial Virus (RSV) Vaccine, MRNA-

1345." The press release represented that "mRNA-1345 met primary efficacy endpoints, demonstrating vaccine efficacy of **83.7%** against RSV lower respiratory tract disease in older adults in the Phase 3 pivotal efficacy trial[.]" The press release further stated the following:

> "We are proud to announce these filings for the use of our RSV vaccine candidate, mRNA-1345, in the European Union, Switzerland, Australia, and the U.S. RSV is a major cause of lower respiratory tract infections in older adults and can cause a significant burden to health systems through hospitalizations and emergency care admissions," said [Defendant] Bancel[.] "Our mRNA platform has allowed us to move from initial clinical testing to our first international Phase 3 trial to initiation of regulatory submissions for mRNA-1345 in just two years, enabling us to tackle this pervasive public health burden with speed and clinical rigor. mRNA-1345 represents the second product coming from our mRNA platform to seek global approval, and with recent positive data in rare disease and cancer, we expect more in the future - further demonstrating the tremendous potential of mRNA to combat disease."

67.    On August 3, 2023, in announcing its financial results for the second quarter of 2023, the Company stated the following, in pertinent part:

> "Second quarter sales were on target, given the seasonal nature of Covid. I am pleased with the progress our U.S. commercial team has made to get new contracts in place for fall 2023. We are on track to deliver 2023 sales between $6 billion to $8 billion, depending on Covid vaccination rates in the U.S.," said [Defendant] Bancel[.] "Our late-stage clinical pipeline is firing on all cylinders with four infectious disease vaccines in Phase 3, including RSV which was recently submitted to regulators for approval. Our individualized neoantigen therapy is now in Phase 3 for melanoma and our lead rare disease program for PA is in dose confirmation. We believe that all these products should launch in 2024, 2025 or 2026, and we are continuing to invest in scaling Moderna to bring forward an unprecedented number of innovative mRNA medicines for patients."

68.    During an earnings call, hosted by the Company on the same day, Defendant Bancel maintained that mRNA-1345 was demonstrating "strong efficacy," stating that "[w]e've also started to manufacture mRNA-1345 in preparation for the launch. As a reminder, at launch, these products will be in a prefilled syringe presentation, *which combined with the strong efficacy profile will position very well our product to healthcare professionals.*" Also during the earnings call, Defendant Hoge stated:

Moving to RSV. As [Defendant Bancel] mentioned earlier, we are pleased to be on track for regulatory approvals in 2024. Earlier this month, we announced a rolling submission to the FDA, and we plan to use a priority voucher to accelerate that review. We also filed additional regulatory applications in Europe, Switzerland, Australia, and the UK. ***We're incredibly encouraged by the profile of mRNA-1345 and look forward to the expected commercial launch next year***.

69.     On September 13, 2023, Moderna issued a press release titled "Moderna Expands the Field of mRNA Medicine with Positive Clinical Results Across Cancer, Rare Disease, and Infectious Disease." In the press release, the Company maintained that mRNA-1345 "met both its primary efficacy endpoints, ***with a vaccine efficacy (VE) of 83.7%***" and stated the following:

> **Expanding the Field of mRNA Medicine**
> Moderna was founded and built to use nature's information molecule, mRNA, to treat and prevent disease. The premise has always been that an mRNA-based approach to making medicine could advance at the pace of information, leveraging common science, technology, and infrastructure to create medicines addressing high unmet needs at unprecedented speed and efficiency.
>
> Through more than a decade of investment in science, the Company has created the field of mRNA medicine. The Company has advanced a diverse pipeline and demonstrated the potential for clinical benefit in cancer (mRNA-4157), in three different rare diseases (mRNA-3705, mRNA-3927, mRNA-3745), and multiple infectious disease vaccines (mRNA-1273, ***mRNA-1345***, mRNA-1010). The Company has advanced six programs into late-stage development, including two approved or filed for approval, and three more that have completed Phase 3 enrollment. The Company expects to double the number of programs in Phase 3 by 2025 and launch up to 15 products in five years across cancer, rare disease, and infectious disease. Up to four of those launches could come by 2025.

70.     On November 2, 2023, in announcing its financial results for the third quarter of 2023, the Company repeated that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of ***83.7%***" and stated the following:

> ***Moderna is preparing for the marketing launch of mRNA-1345 and believes its U.S. COVID-19 market share to date demonstrates the Company's ability to compete in the commercial market***. The Company is encouraged by early indications of strong consumer awareness and demand in the RSV market. Moderna believes that clinical data for its RSV vaccine supports a best-in-class profile and

that its ready-to-use pre-filled syringes (PFS) offer another competitive differentiator over currently licensed products, which require multiple preparatory steps by pharmacists and clinicians. Feedback from clinicians and customers in the COVID-19 market, where Moderna has a similar presentation, validates the benefits of PFS administration. The Company's pre-launch activities at this time are largely focused on scientific exchanges and public health engagements.

71.     On December 14, 2023, Moderna issued a press release titled "Moderna Announces New England Journal of Medicine Publication of Pivotal Phase 3 Clinical Safety and Efficacy Data For MRNA-1345, The Company's Investigational Respiratory Syncytial Virus (RSV) Vaccine." The press release stated the following:

> RSV is a highly contagious virus that causes severe disease across the age spectrum, including older adults. Each year in the U.S., RSV leads to approximately 60,000-160,000 hospitalizations and 6,000-10,000 deaths among older adults. Applications for mRNA-1345 have been submitted to regulators around the world. Moderna is actively preparing for an expected 2024 marketing launch of mRNA-1345 and believes its U.S. COVID-19 market share to date demonstrates the Company's ability to compete in the commercial market. If approved, mRNA-1345 would have a potential best-in-class profile and be the only ready-to-use RSV vaccine available in single-dose prefilled syringes.

72.     On February 22, 2024, Moderna issued a press release announcing its financial results for the fourth quarter and full year 2023, which repeated that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of **_83.7%_**."

73.     During an earnings call, hosted by the Company on the same day, Defendant Hoge stated the following:

> Moving to our RSV vaccine candidates, we are very excited about launching the RSV vaccine this year. That will be the launch of our second product. Our mRNA platform is delivering. The FDA PDUFA date is May 12. If the outcome is positive, we anticipate that ACIP will include mRNA-1345 on the agenda in late June.

>                                        * * *

> Let me now turn to our RSV vaccine profile. **_We believe we have the best profile to serve patients and completing the RSV market, efficacy, safety, and ease of use. Our clinical data shows strong vaccine efficacy_**. We have a well-established safety and tolerability profile that leverages the same mRNA technology that has

been delivered in over 1 billion COVID vaccines. Additionally, we have not seen any case of Guillain-Barre Syndrome or GBS in our Phase 3 trials.

74.    The following day, the Company filed an annual report on Form 10-K with the SEC (the "2023 10-K") signed by Defendants Bancel, Mock, Afeyan, Berenson, Horning, Langer, Nader, Nabel, Sagan, and Tallett.

75.    The 2023 10-K repeated substantially similar statements to those contained in the 2022 10-K regarding the Company's strategy and the efficacy of the mRNA-1345 vaccine, identified above in ¶¶62-63.

76.    On March 21, 2024, Moderna filed a proxy statement on form DEF14 with the SEC (the "2024 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Nabel, Tallett, and Langer to serve for another three-year term on the Company's Board and the compensation of certain of the Company's executive officers including Defendants Bancel, Mock, and Hoge.

77.    The 2024 Proxy highlighted "positive efficacy data" for mRNA-1345, stating:

**Respiratory Vaccine Franchise**. *Following the announcement of positive efficacy data for the Company's vaccine candidate against respiratory syncytial virus (RSV) (mRNA-1345) in older adults in January 2023, the Company moved swiftly to apply for approval from regulators in key markets globally.* The Company is anticipating approval and is preparing for commercial launch of this product in 2024. During 2023, the Company advanced Phase 3 studies for three additional respiratory vaccines programs beyond our original COVID-19 and RSV vaccines: seasonal flu (mRNA-1010), next-generation COVID-19, which is designed to be refrigerator-stable (mRNA-1283), and our combination vaccine against seasonal flu and COVID-19 (mRNA-1083). We believe that combination respiratory vaccines have the potential to improve coverage while also reducing disease burden and producing savings for healthcare systems, both through lower cost of administration and lower healthcare costs by preventing or reducing the need for care. (Emphasis added).

78.    With respect to risk oversight and risk management, the 2024 Proxy stated the following, in pertinent part:

Our Board is responsible for overseeing risk management. It exercises its oversight primarily through its committees. The full Board or applicable committee discusses with management our major risk exposures, their potential impact, and the steps we take to manage them. The Board must satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as intended. When a Board committee is responsible for evaluating and overseeing the management of a particular risk, the Chair of that committee reports on it to the full Board at regular meetings so the Board can coordinate the risk oversight role among the relevant parties. The Board's standing committees each having primary oversight for risks related to the areas set forth below.

\* \* \*

### Audit Committee
### Primary Risk Oversight

- Ensuring the integrity of Moderna's financial statements and related disclosures
- Maintaining effective internal control over financial reporting and policies relating to risk assessment and management.
- Mitigating exposure to major financial risks and taking steps to monitor and control such exposures, including overseeing treasury and tax operations.
- Strengthening our cybersecurity program and protection against other technology-related risks.
- Implementation of policies and procedures related to the receipt, retention and treatment of complaints regarding accounting, internal controls or auditing matters, and handling of whistleblower complaints.
- Ensuring that internal audit and compliance plans are aimed at identifying and mitigating key risks.

79.     The statements identified above in the 2024 Proxy were materially false and misleading because, as detailed herein, the Individual Defendants were overstating the efficacy and commercial prospects for mRNA-1345. Further, despite the 2024 Proxy's descriptions of the Board's and its committees' risk oversight responsibilities, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to issue false and misleading statements.

80.     On March 27, 2024, Moderna issued a press release titled "Moderna Advances

Multiple Vaccine Programs to Late-Stage Clinical Trials." In the press release, the Company reiterated that mRNA- 1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of ***83.7%***."

81.     The statements identified above in ¶¶58-80 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the efficacy of mRNA-1345 was substantially lower than Defendants had repeatedly represented to investors and the public; (ii) accordingly, mRNA-1345's clinical and commercial prospects were significantly overstated; and (iii) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Emerges***

82.     On May 31, 2024, Moderna issued a press release "announc[ing] that the [FDA] has approved mRESVIA (mRNA-1345) . . . to protect adults aged 60 years and older from lower respiratory tract disease caused by RSV infection." The press release revealed that the efficacy of mRNA-1345 was only 78.7%, substantially lower than the 83.7% vaccine efficacy rate that the Individual Defendants repeated throughout the Relevant Period.

83.     On this news, the price of Moderna stock declined by 5.9%, from a close of $151.49 on May 30, 2024 to close at $142.55 per share on May 31, 2024.

84.     On June 26, 2024, during a presentation before the CDC's Advisory Committee on immunization Practices, the Company revealed that after 18 months, mRNA-1345 was only 49.9% to 50.3% effective against multiple symptoms of lower respiratory tract disease—a substantially lower efficacy rate than other vaccines in the market.

85.     In response, *Reuters* published an article, comparing the Company's vaccine

efficacy with its competitors:

> Moderna [. . .] opens new tab respiratory syncytial virus (RSV) shot **_mRESVIA showed 50% efficacy_** in preventing RSV after 18 months, the drugmaker said on Wednesday.
>
> **_In their clinical trials, GSK's RSV vaccine Arexvy was 78% effective in preventing severe RSV over a second year and Pfizer's was 78% effective through a second RSV season._**
>
> Moderna presented the data at a meeting of the U.S. Centers for Disease Control and Prevention's Advisory Committee on Immunization Practices. The drugmaker has previously cautioned against comparing its vaccine to rivals, noting that the trials were not head-to-head and used different case definitions for RSV disease.

86.    Similarly, *Bloomberg* reported on the Company's disappointing clinical data:

> Moderna [. . .] shares sank after new data showed the **_efficacy of its RSV shot fell sharply in the second year and was lower than that of rival vaccines._**
>
> The results could further raise doubts over the prospects for its shot, which is already third to the market. Moderna shares fell as much as 11%, their biggest intraday decline since November.
>
> **_Moderna's shot dropped from 55% efficacy over the first 12 months to 36% in the second year in patients with at least three "lower respiratory" symptoms of RSV,_** according to documents posted Wednesday on the Centers for Disease Control and Prevention website.

* * *

> Jefferies analyst Michael Yee said in a research note that Moderna's new figures were "on the lower end of expectations," while pointing out that comparisons were difficult because the companies studied their vaccines during different seasons.

87.    On this news, the price of Moderna stock declined by 11.01%, from a close of $137.60 on June 25, 2024 to close at $122.45 per share on June 26, 2024.

**_Insider Sales_**

88.    During the Relevant Period, Defendants Bancel, Afeyan, Mock, and Hoge (the "Insider Trading Defendants") each made unusually timed sales of Company stock while in possession of material non-public information concerning the Company's financial condition and

business prospects.

89.    The Insider Trading Defendants collectively reaped more than $300 million in profits selling their personal holdings of Company stock at prices as high as $200.20, more than 160% of the stock's closing price of $122.45 after the corrective disclosures.

***Stock Repurchases During the Relevant Period***

90.    According to the Company's public filings, the Individual Defendants caused the Company to repurchase 8,048,761 shares of its own stock, at an average price of $143.25, for a total of $1.153 billion, between January 1, 2023 and June 1, 2023.

91.    Given that the price of Moderna stock was $122.45 after the corrective disclosures on June 26, 2024, the true value of the 8,048,761 repurchased shares was roughly $985 million. Accordingly, the Individual Defendants caused the Company to overpay by approximately $167 million to repurchase these shares.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

92.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

93.    Moderna is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

94.    Plaintiffs are current shareholders of Moderna and were continuous shareholders of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

95.    At the time this action was commenced, the nine-member Board was comprised

of Defendants Afeyan, Bancel, Horning, Nabel, Nader, Sagan, and Tallett, along with Abbas Hussain and David M. Rubenstein, who are not parties to this action. Accordingly, Plaintiffs are only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least seven of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

96.     The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

97.     The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

98.     As members of the Board charged with overseeing the Company's affairs, each

of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Moderna, the Individual Defendants knew, or should have known, the material facts surrounding the efficacy of Moderna's mRNA-1345 vaccine and the material deficiencies in the Company's disclosure controls.

99.    Defendant Bancel is not disinterested or independent, and therefore, is incapable of considering a demand because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

100.    Moreover, Defendant Bancel is not disinterested or independent because he serves as CEO of Moderna and receives substantial income from his employment with the Company. Accordingly, the 2024 Proxy acknowledges that Defendant Bancel is a non-independent director.

101.    Defendants Tallett and Sagan serve as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements and internal controls over financial reporting. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the efficacy of Moderna's mRNA-1345 vaccine or the adequacy of the Company's disclosure controls as alleged above. Therefore, Defendants Tallett and Sagan cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as

that would expose them to substantial liability and threaten their livelihood.

102.    Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from calling into question the other Individual Defendants' conduct or taking any remedial actions to redress the conduct alleged herein. For instance, none of the Individual Defendants have sought to enforce Moderna's Clawback Policy which grants "the Board or Compensation Committee discretion to recoup performance-based compensation in the event that an Executive Committee member's detrimental conduct causes material financial, operational or reputational harm to the Company."

103.    Many of the Individual Defendants are particularly indebted to one another due to longstanding professional relationships. For instance, Defendants Afeyan and Langer co-founded Moderna together. Defendants Afeyan and Langer also concurrently served as directors of Robius Therapeutics from 2015 until 2019.

104.    Defendants Tallett and Bancel are also incapable of considering a demand to sue each other due to longstanding professional relationships. Defendants Tallett and Bancel concurrently served as directors of Qiagen, Inc. between 2013 and 2021.

105.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Moderna. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the

Individual Defendants were to sue themselves or certain officers of Moderna, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

106.    If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Moderna to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

107.    Accordingly, for all of the reasons set forth above, at least seven of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## <u>COUNT I</u>

**Against the Individual Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

108.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

110.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the Company's goodwill and its internal controls over financial reporting.

111.    The 2024 Proxy was used to solicit shareholder votes in connection with the election of Defendants Nabel, Tallett, and Langer to serve for another three-year term on the Company's Board. In addition, the 2024 Proxy was used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Bancel, Mock, and Hoge. While the shareholder vote was non-binding, the 2024 Proxy indicated that the Board "value[s shareholder] opinion[s] and intend[s] to consider the outcome of the vote when making compensation decisions in the future."

112.    With respect to the Company's compensation philosophy and practices, the 2024 Proxy indicates that compensation is performance based, stating that the "executive compensation program continues to be centered on at-risk, performance-based incentives."

113.    The materially false and misleading statements contained in the 2024 Proxy regarding the efficacy of the Company's mRNA-1345 vaccine and the Company's risk oversight function therefore misleadingly induced shareholders to vote in favor of the election of Defendants Nabel, Tallett, and Langer and performance-based compensation to Defendants Bancel, Mock, and Hoge, to which they were not entitled.

114.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

<u>**COUNT II**</u>

**Against the Individual Defendants for Violations of § 10(b)**
**of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

115.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.    The Individual Defendants participated in a scheme with the purpose and effect of defrauding Moderna. Not only is Moderna now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one

of the largest victims of the unlawful scheme perpetrated upon Moderna by the Individual Defendants.

117.    During the Relevant Period, the Individual Defendants caused the Company to overpay by $167 million to repurchase 8,048,761 shares.

118.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

119.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Moderna not misleading.

120.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Moderna.

121.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from

them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

122.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duties

123.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

125.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

126.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

127.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Actions, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Actions, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

128.     Plaintiffs, on behalf of Moderna, have no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

129.     Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.     By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

131.     Plaintiffs, on behalf of Moderna, have no adequate remedy at law.

## COUNT V

### Against the Insider Trading Defendants For Breach of Fiduciary Duties (*Brophy* Claim)

132.     Plaintiffs incorporate by reference and realleges each and every allegation

contained above, as though fully set forth herein.

133.    During the Relevant Period, the Insider Trading Defendants held positions with the Company that provided them access to confidential, proprietary information concerning the Company's financial condition and future business prospects.  Notwithstanding their duty to refrain from trading in Moderna common stock under the circumstances, the Insider Trading Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

134.    The insider sales detailed herein, were not part of any regular pattern of sales for the Insider Trading Defendants and were suspicious in terms of timing and amount.

135.    The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Moderna stock. At the time of their stock sales, the Insider Trading Defendants were aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease.  The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

136.    Plaintiffs, on behalf of Moderna, have no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for
### Unjust Enrichment

137.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

138.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Moderna.

139.     The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Moderna that was tied to their performance or to the artificially inflated valuation of Moderna.

140.     The Insider Trading Defendants were further unjustly enriched with respect to insider sales of Company stock.

141.     Plaintiffs, as stockholders and representatives of the Company, seek restitution from the Individual Defendants, and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

142.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

143.     Plaintiffs, on behalf of Moderna, have no adequate remedy at law.

## **COUNT VII**

### **Against the Individual Defendants
for Waste of Corporate Assets**

144.     Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.     The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Moderna's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

146.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Class Actions, and approving performance-based compensation linked to the Company's perceived successes.

147.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

148.    Plaintiffs, on behalf of Moderna, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: November 5, 2024                          **THE ROSEN LAW FIRM, P.A.**

                                                 /s/ Joshua Baker
                                                 Joshua Baker (BBO #695561)
                                                 101 Greenwood Avenue, Suite 400
                                                 Jenkintown, Pennsylvania 19046
                                                 Telephone: (215) 600-2817
                                                 Fax: (212) 202-3827
                                                 Email: jbaker@rosenlegal.com

                                                 *Local Counsel for Plaintiffs*

                                                 **RIGRODSKY LAW, P.A.**
                                                 Timothy J. Macfall
                                                 Samir Aougab
                                                 825 East Gate Boulevard, Suite 300
                                                 Garden City, NY 11530
                                                 Telephone: (516) 683-3516
                                                 Facsimile: (302) 654-7530
                                                 Email: sdr@rl-legal.com
                                                 Email: tjm@rl-legal.com
                                                 Email: sa@rl-legal.com

                                                 **GRABAR LAW OFFICES**
                                                 Joshua H. Grabar
                                                 One Liberty Place
                                                 1650 Market Street, Suite 3600
                                                 Philadelphia, PA 19103
                                                 Tel:  267-507-6085
                                                 Email: jgrabar@grabarlaw.com

                                                 *Attorneys for Plaintiffs*

## <u>VERIFICATION OF KEITH WELLMAN</u>

I, Keith Wellman, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 11/4/2024 _____

_____
Keith Wellman

## <u>VERIFICATION OF BRIAN CLUGSTON</u>

I, Brian Clugston, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____11/4/2024_____

_____
DocuSigned by:

*BRIAN CLUGSTON*

B6C731E41876450...

Brian Clugston